IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2022 Term

_____

No. 21-0162

_____

FILED

**April 14, 2022**

**released at 3:00 p.m.**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA
Plaintiff Below, Respondent,

v.

SHAUN RICHARD DUKE,
Defendant Below, Petitioner.

_____

Appeal from the Circuit Court of Nicholas County
The Honorable Stephen O. Callaghan, Judge
Criminal Case No. 34-2020-F-51

AFFIRMED, IN PART;
REVERSED, IN PART, AND REMANDED WITH DIRECTIONS.

_____

Submitted: January 26, 2022
Filed: April 14, 2022

Matthew Brummond, Esq.
Public Defender Services
Charleston, West Virginia
Counsel for Petitioner

Patrick Morrisey, Esq.
Attorney General
Caleb A. Seckman, Esq.
Assistant Solicitor General
Andrea Nease Proper, Esq.
Assistant Attorney General
Charleston, West Virginia
Counsel for Respondent

JUSTICE WOOTON delivered the Opinion of the Court.

JUSTICE MOATS, sitting by temporary assignment, did not participate in this decision.

JUSTICE ARMSTEAD dissents and reserves the right to file a dissenting Opinion.

**SYLLABUS BY THE COURT**

1.      "[A] double jeopardy claim [is] reviewed *de novo*." Syl. Pt. 1, in part, *State v. Sears*, 196 W. Va. 71, 468 S.E.2d 324 (1996).

2.      "Where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not." Syl. Pt. 8, *State v. Zaccagnini*, 172 W. Va. 491, 308 S.E.2d 131 (1983).

3.      "The test of *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932), is a rule of statutory construction. The rule is not controlling where there is a clear indication of contrary legislative intent." Syl. Pt. 5, *State v. Gill*, 187 W. Va. 136, 416 S.E.2d 253 (1992).

4.      "A claim that double jeopardy has been violated based on multiple punishments imposed after a single trial is resolved by determining the legislative intent as to punishment." Syl. Pt. 7, *State v. Gill*, 187 W. Va. 136, 416 S.E.2d 253 (1992).

5.      "In ascertaining legislative intent, a court should look initially at the language of the involved statutes and, if necessary, the legislative history to determine if the legislature has made a clear expression of its intention to aggregate sentences for related

i

crimes. If no such clear legislative intent can be discerned, then the court should analyze the statutes under the test set forth in *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932), to determine whether each offense requires an element of proof the other does not. If there is an element of proof that is different, then the presumption is that the legislature intended to create separate offenses." Syl. Pt. 8, *State v. Gill*, 187 W. Va. 136, 416 S.E.2d 253 (1992).

6. """The test of determining whether a particular offense is a lesser included offense is that the lesser offense must be such that it is impossible to commit the greater offense without first having committed the lesser offense. An offense is not a lesser included offense if it requires the inclusion of an element not required in the greater offense." Syl. Pt. 1, *State v. Louk*, 169 W.Va. 24, 285 S.E.2d 432 (1981), *overruled on other grounds by State v. Jenkins*, 191 W.Va. 87, 443 S.E.2d 244 (1994).' Syllabus Point 4, *State v. Wilkerson*, 230 W.Va. 366, 738 S.E.2d 32 (2013)." Syl. Pt. 5, *State v. Bland*, 239 W. Va. 463, 801 S.E.2d 478 (2017).

7. "Federal and State constitutional double jeopardy principles are violated by serial trials for a greater offense of felony-murder and its lesser-included offense of robbery. U. S. Const. amend. XIV and W. Va. Const. art. III, § 5." Syl., *State ex rel. Hall v. Strickler*, 168 W. Va. 496, 285 S.E.2d 143 (1981).

ii

8. Double jeopardy prohibits an accused charged with delivery of a controlled substance causing death, West Virginia Code § 60A-4-416 (2020), from being separately tried or punished for both the lesser included offense of delivery of a controlled substance, West Virginia Code § 60A-4-401 (2014), and the greater offense of delivery of a controlled substance causing death.

9. "'If an indictment alleges that an offense was done in a particular way, the proof must support such charge or there will be a fatal variance. However, if such averment can be omitted without affecting the charge in the indictment against the accused, such allegation may be considered and rejected as surplusage if not material.' Syllabus point 8, *State v. Crowder*, 146 W.Va. 810, 123 S.E.2d 42 (1961)." Syl. Pt. 2, *State v. Scarberry*, 187 W. Va. 251, 418 S.E.2d 361 (1992).

10. "The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." Syl. Pt. 1, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

11.     "A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." Syl. Pt. 3, in part, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

12.     "'Proof that the defendant was present at the time and place the crime was committed is a factor to be considered by the jury in determining guilt, along with other circumstances, such as the defendant's association with or relation to the perpetrator and his conduct before and after the commission of the crime.' Syllabus Point 10, *State v. Fortner*, 182 W.Va. 345, 387 S.E.2d 812 (1989)." Syl. Pt. 6, *State v. Foster*, 221 W. Va. 629, 656 S.E.2d 74 (2007).

13.     "'Under the concerted action principle, a defendant who is present at the scene of a crime and, by acting with another, contributes to the criminal act, is criminally liable for such offense as if he were the sole perpetrator.' Syllabus Point 11,

*State v. Fortner*, 182 W.Va. 345, 387 S.E.2d 812 (1989)." Syl. Pt. 7, *State v. Foster*, 221 W. Va. 629, 656 S.E.2d 74 (2007).

**WOOTON, Justice:**

The petitioner, Shaun Richard Duke, was convicted by a jury on five drug-related charges. He appeals the January 28, 2021, sentencing order entered by the Circuit Court of Nicholas County, West Virginia.[1]  He argues that his conviction and sentence violated the Double Jeopardy Clause of the United States and West Virginia Constitutions by permitting the jury to convict him of both delivery and delivery causing death; that the circuit court erred in failing to exclude the "jailhouse snitch's testimony" that the petitioner premeditated a murder of the victim on his own, because the evidence was irrelevant to the unintentional and vicarious homicide charged in the indictment, and concerned an uncharged bad act; and that the respondent State of West Virginia's ("the State") evidence was insufficient to prove that he knowingly "contributed to the criminal act" or conspired with the drug dealer.

Upon careful review of the parties' briefs and oral arguments, the appendix record, and the applicable law, we find the circuit court erred in permitting the petitioner

---

[1] The circuit court imposed the following sentence: one to five years of incarceration on Count 1, delivery of a controlled substance; one to fifteen years of incarceration on Count 2, delivery of a controlled substance; ten years of incarceration on Count 3, conspiracy to commit a felony; fifteen years of incarceration on Count 4, drug delivery resulting in death; and two to ten years of incarceration on Count 5, possession of Fentanyl. All of the sentences were ordered to run consecutively.  The court also imposed a fine in the amount of $15,000 as part of the petitioner's sentence imposed for Count 1 and a fine in the amount of $25,000 as part of the sentence imposed for Count 2.

to be convicted of both delivery of a controlled substance[2] and delivery of a controlled substance causing death[3] because the convictions in this case violated the constitutional prohibition against putting an individual twice in jeopardy. We further determine that there is no error in regard to the petitioner's remaining two issues. Therefore, we reverse the petitioner's convictions in regard to both Counts 1 and 2, pertaining to delivery of controlled substances methamphetamine and Fentanyl, and remand the case to the circuit court for resentencing; the remainder of the petitioner's convictions and sentences are affirmed.

## I. Facts and Procedural Background

In this case, the petitioner permitted Erica Westfall, a drug dealer, to use his vehicle in order to carry out the delivery of methamphetamine and Fentanyl to Teddy Nutter ("the victim") and his girlfriend, Ann Russell. Both the petitioner and Ms. Westfall were implicated in the delivery of those controlled substances to the victim, which resulted in the victim's death due to methamphetamine and Fentanyl intoxication.

Based upon these basic facts, the petitioner was indicted on June 16, 2020, on five counts: (1) delivery of a controlled substance (methamphetamine), in concert with Erica Westfall; (2) delivery of a controlled substance (Fentanyl), in concert with Erica

---

[2] *See* W. Va. Code § 60A-4-401(2014).

[3] *See* W. Va. Code § 60A-4-416 (2020).

2

Westfall; (3) conspiracy to commit a felony in violation of West Virginia Code § 60A-4-401; (4) delivery of a controlled substance resulting in death, in concert with Erica Westfall; and (5) possession of Fentanyl, in concert with Erica Westfall. Critically, Count 4 charges that the petitioner, acting in concert with Ms. Westfall,

> committed the offense of "DELIVERY OF A CONTROLLED SUBSTANCE RESULTING IN DEATH" by unlawfully, intentionally, knowingly, willfully, and feloniously delivering unto Teddy J. Nutter controlled substances which was [sic] the proximate cause of his death. SHAUN RICHARD DUKE acting in concert with ERICA LEIGH WESTFALL did deliver unto Teddy J. Nutter Fentanyl, a Schedule II Narcotic Controlled Substance, and Methamphetamine, a Schedule II Non-Narcotic Controlled Substance, which when ingested in combination with one another, was the proximate cause of his death, against the peace and dignity of the State of West Virginia.

A three-day trial began on August 25, 2020. The evidence introduced included the testimony of Sgt. Jarred S. Bennett with the Nicholas County Sheriff's Department. He testified that on September 24, 2019, he responded to a call that a deceased person had been dropped off at Summersville Regional Medical Center's emergency room. Two individuals had dropped the body and fled the scene. Sgt. Bennett stated that from a description of the vehicle involved in dropping the body, Ms. Russell, the victim's girlfriend, was located and stopped. [4] Sgt. Bennett testified that Ms. Russell agreed to give

---

[4] The other individual was identified as Frank Young, who is not involved in this proceeding.

3

a statement.[5] She told Sgt. Bennett that Erica Westfall came to her trailer between 4:00 a.m. and 5:00 a.m. on September 24 to sell drugs. Ms. Russell also told the officer that Ms. Westfall was driven to her home by the petitioner.[6]

Ms. Westfall also testified that she suffered from drug addiction and had sold methamphetamine and heroin to support herself for approximately a year and had sold drugs to both the victim and Ms. Russell. She met the petitioner four to five months prior to the events herein and stated that he would stop by her home a couple of times a week. Ms. Westfall did not have a car and would sometimes get rides with the petitioner in his car, which she described as a white Oldsmobile. She stated that she would give the petitioner drugs or cash in exchange for the transportation but never sold drugs to him.

Ms. Westfall testified that on September 24, 2019, she received a text from Ms. Russell, who wanted to buy heroin. [7] She stated that the petitioner showed up at her house sometime just after midnight on September 24 and she informed him that she had

---

[5] Sgt. Bennett testified that both Ms. Russell and Ms. Westfall gave statements after being Mirandized. *See Miranda v. Arizona*, 384 U.S. 436 (1966).

[6] Sgt. Bennett stated that they tried to locate the petitioner several times. On the day he was arrested, he did not want to be interviewed.

[7] While both Ms. Westfall and Ms. Russell testified to buying and selling heroin, not Fentanyl, the autopsy report performed on the victim and a drug test performed on Ms. Russell after her arrest confirmed that one of the drugs was Fentanyl, not heroin. Importantly, the counts in the petitioner's indictment pertained to Fentanyl, not heroin.

just received a delivery of methamphetamine and heroin. She stated that because she had been fighting with her roommate, she and the petitioner left the house almost as soon as he arrived. They drove to a remote area of Nicholas County known as "Gilboa Holler," parked the petitioner's car, and got high taking drugs. Both she and the petitioner spent about three hours talking while smoking methamphetamine and heroin, which she provided to him in exchange for the use of his vehicle. Ms. Westfall stated that during this time her intention was to "sell what [she] needed" to Ms. Russell and the victim. She indicated that even though she did not recall "the nature of . . . [the] conversations that evening[]" with the petitioner, she assumed that her decision to stop by Ms. Russell's house to sell drugs came up in their conversation.[8] Ms. Westfall again stated during cross-examination that she believed she and the petitioner discussed stopping by Ms. Russell's, adding that "I didn't say for sure that I was going to stop by there, but I mentioned it." Ms. Westfall and the petitioner left this area with Ms. Westfall driving, and although she was going to get cigarettes, she turned around and drove to Ms. Russell's house instead. The petitioner was "in and out" of sleep when they drove to Ms. Russell's house.

Ms. Westfall stated that when they arrived at Ms. Russell's home she went to the door alone, leaving the petitioner in his car. She stated that she let both the victim and Ms. Russell know that the petitioner was in the car and asked them if it was okay if he

_____

[8] Ms. Westfall was referring to text messages exchanged with Ms. Russell, who wanted to purchase drugs from Ms. Westfall.

5

came into the home too. She then returned to petitioner's car to get her scales out of her purse and to get the petitioner. Ms. Westfall testified that the petitioner could see her remove the scales from her purse and that she "believe[d] that he knew what [she] w[as] going to do." The petitioner accompanied her back into Ms. Russell's home, where Ms. Westfall and the victim had a discussion about what he wanted to buy "drug-wise." Ms. Westfall stated that the victim wanted to try the methamphetamine, so they smoked some of it before he purchased drugs from her. As she stated, "I gave Teddy the drugs, and he gave me the money." She further stated that the victim, Ms. Russell, and the petitioner were all present during this transaction. Thereafter, Ms. Westfall, Ms. Russell, and the victim all proceeded to get high using methamphetamine. Ms. Westfall stated that they left the house around 5:00 a.m., after staying there about forty-five minutes.[9]

After leaving Ms. Russell's home, Ms. Westfall and the petitioner parked at a vacant house next door to Ms. Westfall's home and took more drugs. Ms. Russell came by Ms. Westfall's home around 8:30 or 9:00 in the morning, asking if Ms. Westfall and the petitioner wanted to go with her to a gas station.[10] They went to a gas station in Ms.

---

[9] Ms. Westfall stated that she had signed a plea agreement for her testimony in the petitioner's case. She agreed to plead guilty to a drug delivery causing death count and a drug delivery charge for which she would receive a sentence of three to fifteen years and one to fifteen years, respectively.

[10] Video surveillance from the gas station confirmed that the petitioner, Ms. Westfall, and Ms. Russell were at a gas station in Drennan, West Virginia.

Russell's car, after which they returned to Ms. Westfall's home, the petitioner left in his vehicle, and Ms. Russell stayed another hour or so.

Ms. Russell also testified during trial. She stated that she met the victim and began dating him while both were in a drug court program. She admitted that they both used drugs while living together, including methamphetamine and heroin. On September 23, after she and the victim took a drug screen they went home and "smoked a little bit of meth[.]" Ms. Russell admitted to texting Ms. Westfall about buying methamphetamine and heroin from her. Although Ms. Westfall responded that she only had methamphetamine, Ms. Russell did not receive that text from her; nonetheless, Ms. Russell testified that Ms. Westfall showed up at her trailer in the petitioner's vehicle in the early morning hours of September 24 to complete the drug transaction. Ms. Russell confirmed that Ms. Westfall was alone when she came into the residence and that the petitioner was outside asleep in the vehicle. Ms. Westfall asked her if the petitioner could come into her trailer. Ms. Westfall then returned to the vehicle to tell the petitioner he could come in and to get her scales from her purse, which were needed to complete the drug transaction. When the petitioner went into the house he sat beside the victim, who Ms. Russell stated knew the petitioner, and the two men began to converse.

Thereafter, the victim, Ms. Westfall and Ms. Russell proceeded to get high. Ms. Russell testified that after the petitioner and Ms. Westfall left her home, the victim shot heroin intravenously. After doing this, the victim began to "nod out," which she

7

explained meant "ready to sleep." Later, Ms. Russell left a note for the victim, who was sleeping on the couch, indicating that she was going to dismantle and pick up a storage building. Ms. Russell testified that the victim was still breathing when she left. Ms. Russell then went to Ms. Westfall's home, where both Ms. Westfall and the petitioner were present. After looking at the storage building, they went to a local gas station together in Ms. Russell's car because she needed cigarettes, and then returned to Ms. Westfall's home.

Ms. Russell stated that when she returned to her trailer, she thought the victim was sleeping. She proceeded to do some work outside on her porch and then took a nap herself. After she awoke, she tried to wake up the victim, but he was unresponsive. Ms. Russell testified that there was a needle lying near the victim, but that he did not have any track marks or needle marks when he shot up. She stated that she ran to get a neighbor to take the victim to the hospital. When she arrived at the hospital she ran inside and told them the victim needed Narcan, but the hospital staff informed her that the victim was deceased. Ms. Russell testified that when she returned home, she flushed all of the remaining drugs and drug paraphernalia down the toilet, including a needle/syringe.

Dr. Thomas Young, a forensic pathologist with the Office of the Chief Medical Examiner of West Virginia, testified that the victim's cause of death was Fentanyl and methamphetamine intoxication. Dr. Young testified that he believed the victim inhaled the drugs but could not testify to that with a reasonable degree of medical certainty. The doctor stated if the drugs were injected there "might not necessarily be . . . [an injection

8

site] that . . . [he] could find." However, Dr. Young testified that he did not notice any puncture marks on the victim's arms or legs.

Corey Smith also testified at trial. Mr. Smith was housed at Central Regional Jail for approximately one year while he awaited federal sentencing based on drug charges in connection with his importation of approximately 170,000 pounds of methamphetamine into West Virginia.[11] The petitioner was Mr. Smith's cellmate. Mr. Smith testified that the petitioner told him that he was incarcerated for murder and discussed his charges with him. Significantly, Mr. Smith had never been to Summersville, West Virginia, and did not know any of the individuals involved in the petitioner's version of events as related to Mr. Smith. The petitioner told Mr. Smith that he and Ms. Westfall went in his car to the trailer where Ms. Russell and the victim lived. The petitioner told Mr. Smith that Ms. Westfall, Ms. Russell and the victim were taking heroin and Fentanyl and that the victim "nodded out." The petitioner told Mr. Smith that the victim was "supposedly ratting on somebody . . . [the petitioner] was close with." According to Mr. Smith, the petitioner stated that he, along with Ms. Westfall and Ms. Russell left to go to a gas station. Mr. Smith testified that the petitioner told him that he left the gas station, returned to the trailer, and injected Fentanyl into the victim. Although he was awaiting sentencing on federal charges, Mr. Smith testified that he did not have a prior criminal history and was not promised anything

---

[11] Mr. Smith testified that he pleaded guilty to "aiding and abetting, 50 grams or more."

either from the State or federal prosecutor for his testimony. Mr. Smith stated that the reason he came forward was because he had a conversation with his mother who told him to "step up and do the right thing."

After the State rested, the petitioner moved for judgment of acquittal, arguing that the State failed to prove the elements of the five counts against him. The petitioner also renewed his pretrial motions.[12] The circuit court denied the motions.

The defense rested without presenting any testimony or evidence. Following closing arguments and jury instructions, the jury began deliberating. During its deliberations, the jury requested to see the surveillance video from the gas station again. After deliberating for about four hours, the jury indicated it was deadlocked, after which

---

[12] The petitioner's pre-trial motions included a motion to dismiss the delivery counts. He argued that one cannot deliver drugs resulting in death without first delivering drugs, and a conviction for both would violate double jeopardy. The State responded that the Legislature intended the offenses to stack. The circuit court deferred ruling on the motion until after trial. The court denied the motion to dismiss post-trial.

The petitioner also moved to exclude Mr. Smith's testimony, arguing that the testimony was irrelevant to the charged conduct and was only relevant to prove premediated murder. He further argued that it was more prejudicial than probative and too unreliable to be believed. The circuit court denied the petitioner's motion, finding that the testimony directly related to the charges contained in the indictment and that it contained inculpatory statements made by the petitioner. The petitioner renewed this motion post-conviction where it was again denied by the court.

the circuit court gave an *Allen* charge[13] over petitioner's objection. About an hour later, the jury reached its verdict, finding the petitioner guilty on all five counts.[14]

By order entered January 28, 2020, the petitioner was sentenced as follows: one to five years of incarceration on Count 1, delivery of a controlled substance; one to fifteen years of incarceration on Count 2, delivery of a controlled substance; ten years of incarceration on Count 3, conspiracy to commit a felony; fifteen years of incarceration on Count 4, drug delivery resulting in death; and two to ten years of incarceration on Count 5, possession of Fentanyl. The circuit court ordered all sentences to run consecutively. It is from this order that petitioner appeals.

## II. Standard of Review

Each of the petitioner's three assigned errors has a different standard of review. Therefore, the appliable standards of review are set forth in the discussion of each issue.

---

[13]"The *Allen* charge, often called the 'dynamite charge,' is a supplemental instruction given to encourage deadlocked juries to reach agreement." Franklin D. Cleckley, 2 *Handbook on West Virginia Criminal Procedure*, at 257 (2nd ed.1993); *see Allen v. United States*, 164 U.S. 492 (1896).

[14] The petitioner made several post-trial motions, including a motion for a new trial. The arguments in the motion for a new trial included a renewal of his arguments that Mr. Smith's testimony should have been excluded, that double jeopardy principles were violated, and that the evidence was insufficient to sustain his convictions. After a hearing, the circuit court denied the motions.

## III. Discussion

## A. Double Jeopardy

First, we address the determinative issue in this appeal: whether the circuit court violated the Double Jeopardy Clauses[15] of the United States and West Virginia Constitutions by permitting the petitioner to be convicted and sentenced for both delivery of a controlled substance, West Virginia Code § 60A-4-401, and delivery of a controlled substance causing death, West Virginia Code § 60A-4-416. "[A] double jeopardy claim [is] reviewed *de novo*." Syl. Pt. 1, in part, *State v. Sears*, 196 W. Va. 71, 468 S.E.2d 324 (1996); *accord Mirandy v. Smith*, 237 W. Va. 363, 366, 787 S.E.2d 634, 637 (2016) ("Our review of double jeopardy claims is de novo.").

The petitioner argues that because section 60A-4-416 explicitly incorporates a section 60A-4-401 delivery as an essential element, an individual cannot violate section 60A-4-416 without first violating section 60A-4-401. He also argues that the "clerical choice" of the Legislature to create two separate statutory provisions does not demonstrate a legislative intent to stack the offenses. Instead, he maintains that "[i]f the legislature intended Sections 401 and 416 to stack, it would have said so. It did not. Without 'a clear indication of contrary legislative intent,' Section 401 is a lesser included offense," and a defendant cannot be convicted and punished for both crimes.

---

[15] *See* W. Va. Const. art. 3, §5 ("No person shall ... be twice put in jeopardy of life or liberty for the same offence."); *see also* U.S. Const. amend. V ("[N]or shall any person be subject for the same offence to be twice put in jeopardy of life and limb.").

Conversely, the State argues that consistent with the Legislature's power to prescribe penalties for any particular crime, double jeopardy is not offended by the existence of separate, multiple offenses that are specifically intended to criminalize and punish drug-related conduct.[16] The State contends that the *Blockburger* test[17] is not controlling where there is a clear indication of legislative intent to create a separate and distinct felony subject to a separate punishment. *See* Syl. Pt. 8, *State v. Zaccagnini*, 172 W. Va. 491, 308 S.E.2d 131 (1983) (adopting *Blockburger* test which is discussed *infra* in greater detail). In this regard, the State argues that "because the legislative intent to punish drug-related conduct under multiple statutes is abundantly clear from the face of the statute, West Virginia Code § 60A-4-416, punishing Petitioner for violating West Virginia Code § 60A-4-401, as well as causing death while violating that provision, does not violate Double Jeopardy." We disagree.

---

[16] *See Garrett v. United States*, 471 U.S. 773, 778 (1985) ("Where the same conduct violates two statutory provisions, the first step in the double jeopardy analysis is to determine whether the Legislature – in this case Congress – intended that each violation be a separate offense."); *Missouri v. Hunter*, 459 U.S. 359, 368-69 (1983) ("Where . . . a legislature specifically authorizes cumulative punishments under two statutes, regardless of whether those two statutes proscribe the 'same' conduct under *Blockburger*, a court's task of statutory construction is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment.").

[17] *See Blockburger v. United States*, 284 U.S. 299, 304 (1932) ("[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not.").

13

This Court adopted the *Blockburger* test in syllabus point eight of *Zaccagnini*, holding that "[w]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not." 172 W. Va. at 493, 308 S.E.2d at 133, Syl. Pt. 8. Thereafter, in syllabus point five of *State v. Gill*, 187 W. Va. 136, 416 S.E.2d 253 (1992), we held that "[t]he test of *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932), is a rule of statutory construction. The rule is not controlling where there is a clear indication of contrary legislative intent." We further held:

> A claim that double jeopardy has been violated based on multiple punishments imposed after a single trial is resolved by determining the legislative intent as to punishment.

> In ascertaining legislative intent, a court should look initially at the language of the involved statutes and, if necessary, the legislative history to determine if the legislature has made a clear expression of its intention to aggregate sentences for related crimes. If no such clear legislative intent can be discerned, then the court should analyze the statutes under the test set forth in *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932), to determine whether each offense requires an element of proof the other does not. If there is an element of proof that is different, then the presumption is that the legislature intended to create separate offenses.

*Gill*, 187 W. Va. at 138, 416 S.E.2d at 255, Syl. Pts. 7 and 8.

Applying the requisite *Gill* analysis, we begin by examining the two relevant statutes. West Virginia Code § 60A-4-401 provides:

(a) Except as authorized by this act, it is unlawful for any person to manufacture, deliver, or possess with intent to manufacture or deliver, a controlled substance.

Any person who violates this subsection with respect to:

(i) A controlled substance classified in Schedule I or II, which is a narcotic drug, is guilty of a felony and, upon conviction, may be imprisoned in the state correctional facility for not less than one year nor more than fifteen years, or fined not more than twenty-five thousand dollars, or both;

(ii) Any other controlled substance classified in Schedule I, II or III is guilty of a felony and, upon conviction, may be imprisoned in the state correctional facility for not less than one year nor more than five years, or fined not more than fifteen thousand dollars, or both;

(iii) A substance classified in Schedule IV is guilty of a felony and, upon conviction, may be imprisoned in the state correctional facility for not less than one year nor more than three years, or fined not more than ten thousand dollars, or both; . . . .

West Virginia Code § 60A-4-416 (a) provides:

(a) Any person who knowingly and willfully delivers a controlled substance or counterfeit controlled substance *in violation of the provisions of section four hundred one, article four of this chapter for an illicit purpose and the use, ingestion or consumption of the controlled substance or counterfeit controlled substance alone or in combination with one or more other controlled substances,* proximately causes the death of a person using, ingesting or consuming the controlled substance, is guilty of a felony and, upon conviction thereof, shall be imprisoned in a state correctional facility for a determinate sentence of not less than three nor more than fifteen years.

(Emphasis added).

Nothing in this statutory language evidences a clear intent on the part of the Legislature to aggregate the sentences for the crimes of delivery of a controlled substance and delivery of a controlled substance causing death. In this regard, when the Legislature has intended that sentences be aggregated it has expressed such intent in very explicit language. For example, as the Court noted in *Gill*, in creating new and distinct crimes and punishments for the offense of sexual abuse by a parent, guardian, custodian or person in a position of trust, West Virginia Code § 61-8D-5 (2020), the Legislature included the phrase "[i]n addition to any other offenses set forth in this code, the Legislature hereby declares a separate and distinct offense under this subsection. . . ." *Id*. By using this type of language,

> [t]he legislature has clearly and unequivocally declared its intention that sexual abuse involving parents, custodians, or guardians, W. Va. Code, 61-8D-5, is a separate and distinct crime from general sexual offenses, W. Va. Code, 61-8B-1, *et seq.*, for purposes of punishment. Consequently, separate sentences for both crimes were permissible in a trial involving the same acts.

*Gill*, 187 W. Va. at 143-44, 416 S.E.2d at 260-61. Additional examples of clear legislative intent to aggregate sentences or to have a separate and distinct punishment include: West Virginia Code § Code 60A-4-411 (pertaining to operating clandestine drug lab which is located in the same subsection as delivery causing death and providing that "(d) The offenses in subsections (a) and (b) of this section are separate and distinct offenses and subsection (a) of this section shall not be construed to be a lesser included offense of subsection (b) of this section."); and West Virginia Code § 60A-4-409 (relating to transportation of controlled substances into this State which is located in the same

16

subsection as delivery causing death and providing that "(f) The offense established by this section shall be in addition to and a separate and distinct offense from any other offense set forth in this code."). The foregoing is representative of the type of statutory language utilized by the Legislature when it intends to establish separate and distinct punishments for multiple crimes involving the same acts. In contrast, in the two statutes at issue in this case there is no clear expression of such legislative intent.

Given the lack of any clear legislative intent to aggregate, we proceed to analyze the statutes "to determine whether each offense requires an element of proof the other does not. If there is an element of proof that is different, then the presumption is that the legislature intended to create separate offenses." *Gill*, 187 W. Va. at 138, 416 S.E.2d at 255, Syl. Pt. 8, in part. In this regard, West Virginia Code § 60A-4-416(a), delivery of a controlled substances causing death, expressly makes delivery of a controlled substance, section 60A-4-401, an essential element of the crime:

> Any person who knowingly and willfully delivers a controlled substance or counterfeit controlled substance *in violation of the provisions of section four hundred one, article four of this chapter* for an illicit purpose and the use, ingestion or consumption of the controlled substance or counterfeit controlled substance alone or in combination with one or more other controlled substances, proximately causes the death of a person using, ingesting or consuming the controlled substance,

W. Va. Code § 60A-4-416(a) (emphasis added). Conversely, West Virginia Code § 60A-4-401, delivery of a controlled substance, does not require proof of any fact beyond those in West Virginia Code § 60A-4-416(a), delivery of a controlled substance causing death.

17

Further, we held in syllabus point five of *State v. Bland*, 239 W. Va. 463, 801 S.E.2d 478 (2017):

> "The test of determining whether a particular offense is a lesser included offense is that the lesser offense must be such that it is impossible to commit the greater offense without first having committed the lesser offense. An offense is not a lesser included offense if it requires the inclusion of an element not required in the greater offense." Syl. Pt. 1, *State v. Louk*, 169 W. Va. 24, 285 S.E.2d 432 (1981), *overruled on other grounds by State v. Jenkins*, 191 W. Va. 87, 443 S.E.2d 244 (1994). Syllabus Point 4, *State v. Wilkerson*, 230 W. Va. 366, 738 S.E.2d 32 (2013).

*Accord* Syl. Pt. 5, *State v. Wilson*, 244 W. Va. 370, 853 S.E.2d 610 (2020). We also held in the sole syllabus *of State ex rel. Hall v. Strickler*, 168 W. Va. 496, 285 S.E.2d 143 (1981), that "Federal and State constitutional double jeopardy principles are violated by serial trials for a greater offense of felony-murder and its lesser-included offense of robbery. U. S. Const. amend. XIV and W. Va. Const. art. III, § 5." *See State ex rel. Games-Neely v. Silver*, 226 W. Va. 11, 14 n.1, 697 S.E.2d 47, 50 n.1 (2010) ("As we recognized in *State ex rel. Hall v. Strickler*, 168 W.Va. 496, 285 S.E.2d 143 (1981), successive prosecutions for greater and lesser included offenses which occur in the same sequence of events are typically barred by double jeopardy principles."); *see also State v. Henning*, 238 W. Va. 193, 199, 793 S.E.2d 843, 849 (2016) ("Critically, if we were to find that the offense of assault, when committed by placing another in apprehension of pain or injury, is not a lesser included offense of malicious assault, then an accused could potentially be charged with both offenses for the same act or transaction. *Double jeopardy principles, however, would preclude convictions for both offenses*.") (emphasis added). Thus, delivery of a

18

controlled substance is a lesser included offense of delivery of a controlled substance causing death, and double jeopardy principles are implicated which prohibit being tried and punished for both.

We therefore hold that double jeopardy prohibits an accused charged with delivery of a controlled substance causing death, West Virginia Code § 60A-4-416 (2020), from being separately tried or punished for both the lesser included offense of delivery of a controlled substance, West Virginia Code § 60A-4-401 (2014), and the greater offense of delivery of a controlled substance causing death. *See* Syl. Pt. 8*, State v. Williams*, 172 W. Va. 295, 305 S.E.2d 251 (1983) ("Double jeopardy prohibits an accused charged with felony-murder, as defined by W. Va. Code § 61-2-1 (1977 Replacement Vol.), from being separately tried or punished for both murder and the underlying enumerated felony.").

Applying this holding to the instant case, the indictment in this case charged that the petitioner committed the offense of delivery of a controlled substance resulting in death by intentionally and knowingly delivering to the victim both "Fentanyl, a Schedule II Narcotic Controlled Substance, and Methamphetamine, a Schedule II Non-Narcotic Controlled Substance, which when ingested in combination with one another, was the proximate cause of" the victim's death.  Further, the evidence supported the indictment insofar as it showed that the delivery and ingestion of both controlled substances resulted in the victim's death.  Accordingly, to afford the petitioner the double jeopardy protections to which he is constitutionally entitled, we reverse the petitioner's convictions and

19

sentences imposed by the circuit court for both delivery of controlled substance charges –

Counts 1 and 2 – and remand this case for resentencing consistent with this opinion.

## B. Informant's Testimony

The second issue raised by the petitioner is his contention that the circuit court erred in failing to exclude the testimony of the petitioner's cellmate, Mr. Smith. The circuit court determined that Mr. Smith's testimony "relate[d] directly to the charges contained in the indictment" and that the petitioner's statements made to Mr. Smith were inculpatory. We analyze evidentiary rulings under the following standard of review:

> The West Virginia Rules of Evidence . . . allocate significant discretion to the trial court in making evidentiary . . . rulings. Thus, rulings on the admission of evidence . . . are committed to the discretion of the trial court. Absent a few exceptions, this Court will review evidentiary . . . rulings of the circuit court under an abuse of discretion standard.

*State v. Swims*, 212 W. Va. 263, 269-70, 569 S.E.2d 784, 790-91 (2002) (quoting Syl. Pt. 9, *Tudor v. Charleston Area Med. Ctr., Inc.*, 203 W. Va. 111, 506 S.E.2d 554 (1997)).

The petitioner argues that the testimony should have been excluded because "the snitch's [Corey Smith's] accusation of uncharged misconduct" fell under West Virginia Rule of Evidence 404(b),[18] and the State had no "legitimate use for the testimony."

---

[18] West Virginia Rule of Evidence 404(b) provides:

The petitioner also claims that Mr. Smith's testimony to the effect that the petitioner

"premeditated an intentional murder" of the victim brought "uncharged misconduct" into

play and "constituted a fatal variance" in the indictment. Finally, petitioner argues that Mr.

---

> (1) *Prohibited uses*. – Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
>
> (2) *Permitted uses; notice required*. – This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. . . .

It is significant to note that a review of the hearing transcript in regard to the pretrial motions raised by the petitioner, which included his motion to exclude Mr. Smith's testimony, failed to include any reference by the petitioner's counsel to a Rule 404(b)-type argument to the effect that the evidence was being offered to prove the petitioner's bad character and conformity therewith. Instead, what petitioner's counsel argued was that "[i]f the prosecutor wants to charge my client with the other crimes, then let's address those in another tribunal under a proper indictment and warrant." The petitioner's counsel also argued that "what we're essentially doing is trying Mr. Duke on attempted murder, and we're charging him on – we're – we're also trying him, not on the underlying drug charges and what he's already facing, but these additional allegations by this man [referring to Mr. Smith] that really shouldn't be given any credibility under these circumstances."

This Court has previously stated that a petitioner's failure to make an objection before the trial court in regard to the inadmissibility of "evidence of a crime, wrong, or other act" to prove petitioner's bad character and that he was acting in accordance with the character pursuant to Rule 404(b) precludes our review of his argument in that regard. *State v. DeGraw*, 196 W. Va. 261, 272, 470 S.E.2d 215, 226 (1996) ("[T]he Appellant's failure to raise a Rule 404(b) objection before the trial court precludes us from reviewing his Rule 404(b) argument."); *see also State v. Hypes*, 230 W. Va. 390, 394 n.9, 738 S.E.2d 554, 558 n.9 (2013) (noting the lack of petitioner's Rule 404(b) objection before the trial court to preserve his argument that his voluntary statement given to police was admitted in violation of Rule 404(b).). Had an argument pursuant to Rule 404(b) been raised before the circuit court, then it should have considered the admissibility of the evidence on that ground, s*ee State v. McGinnis*, 193 W. Va. 147,455 S.E.2d 516 (1994), and whether a cautionary instruction was warranted.

21

Smith's testimony was "insufficiently reliable for a court to find it truthful by a preponderance of the evidence." We disagree with the petitioner and conclude that the circuit court did not err in admitting the testimony.

Despite what appears from the record to be the lack of a clear challenge to the admissibility of Mr. Smith's testimony based on Rule 404(b), *see supra* note 19, we agree with the State's position that Mr. Smith's testimony is intrinsic evidence of the crime with which the petitioner was charged. *See State v. LaRock*, 196 W. Va. 294, 312-13, 470 S.E.2d 613, 631-32 (1996) (finding "the evidence is not unrelated but integrally is connected to the criminal activity charged in the indictment"). In *LaRock*, the Court stated that

> [i]n determining whether the admissibility of evidence of "other bad acts" is governed by Rule 404(b), we first must determine if the evidence is "intrinsic" or "extrinsic." *See United States v. Williams*, 900 F.2d 823, 825 (5th Cir.1990): "'Other act' evidence is 'intrinsic' when the evidence of the other act and the evidence of the crime charged are 'inextricably intertwined' or both acts are part of a 'single criminal episode' or the other acts were 'necessary preliminaries' to the crime charged." (Citations omitted). If the proffer fits into the "intrinsic" category, evidence of other crimes should not be suppressed when those facts come in as *res gestae*—as part and parcel of the proof charged in the indictment. *See United States v. Masters*, 622 F.2d 83, 86 (4th Cir. 1980) (stating evidence is admissible when it provides the context of the crime, "is necessary to a 'full presentation' of the case, or is . . . appropriate in order 'to complete the story of the crime on trial by proving its immediate context or the "res gestae"'"). (Citations omitted).

*LaRock*, 196 W. Va. at 312 n.29, 470 S.E.2d at 631 n.29. Here, Mr. Smith's testimony was "inextricably intertwined" with the evidence of the crimes charged and was therefore properly admitted at trial. *See id*. His testimony revealed that while the petitioner was Mr. Smith's cellmate the petitioner discussed his charges with Mr. Smith. The petitioner told Mr. Smith that both he and Ms. Westfall, travelling in the petitioner's car, went to Ms. Russell's and the victim's trailer on the night the victim died. Mr. Smith also confirmed that the petitioner knew that Ms. Russell, Ms. Westfall, and the victim were doing drugs, including heroin and Fentanyl. Mr. Smith's testimony clearly supported the petitioner's knowing participation, or at least active assistance, in the drug delivery that caused the victim's death. The testimony further contradicted the petitioner's defense that he was merely a passive participant in a delivery of drugs that the victim ingested, thereby resulting in his death.

Next, we address, and readily resolve, the petitioner's assertion that a "variance" to the indictment occurred as a result of Mr. Smith's testimony. This Court previously held that

> [i]f an indictment alleges that an offense was done in a particular way, the proof must support such charge or there will be a fatal variance. However, if such averment can be omitted without affecting the charge in the indictment against the accused, such allegation may be considered and rejected as surplusage if not material. Syllabus point 8, *State v. Crowder*, 146 W.Va. 810, 123 S.E.2d 42 (1961).

Syl. Pt. 2, *State v. Scarberry*, 187 W. Va. 151, 418 S.E.2d 361 (1992). Further, "[t]he variance between the indictment and the proof is considered material only where the

23

variance misleads the defendant in making his defense and exposes him to the danger of being put in jeopardy again for the same offense." *Id.* at 255-56, 418 S.E.2d at 365-66 (internal quotation and citation omitted).

Here, there is no fatal variance between the indictment and the evidence presented at trial. The petitioner was charged with delivery of a controlled substance which resulted in, or was the proximate cause of, the victim's death. The petitioner claims that Mr. Smith's testimony supported only a first-degree murder charge, and because he was not indicted on first-degree murder, the testimony was inadmissible. This argument ignores the portions of Mr. Smith's testimony corroborating that the petitioner was with Ms. Westfall, Ms. Russell and the victim on the night of the victim's death, and that by allowing his vehicle to be used in Ms. Westfall's delivery of drugs to the victim, the petitioner was an active participant in the delivery of drugs that caused the victim's death.[19]

---

[19] The petitioner's argument that the circuit court should have excluded Mr. Smith's testimony because it was "incredible" is without merit. Mr. Smith's testimony regarding the various actors in the crime could only have been known to him if the petitioner had indeed relayed the information to him. Mr. Smith testified that he was not from Summersville, West Virginia, where the events occurred, and had no connection to any of the actors other than the petitioner. He further testified that he did not receive any promises from the prosecutor or federal authorities in regard to his federal charges as a result of his testimony. Consequently, the circuit court did not error in admitting the testimony. Further, the credibility determinations made during trial are left to the sole purview of the jury. *See* Syl. Pt. 3, in part, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995) ("Credibility determinations are for a jury and not an appellate court.").

## C. Sufficiency of the Evidence

The third issue is a challenge to the sufficiency of the evidence to show that the petitioner conspired "or acted in concert with" Ms. Westfall, the drug dealer.[20] This Court examines issues pertaining to the sufficiency of the evidence challenges under the following standards of review:

> The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

> . . . .

> A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.

---

[20] The petitioner appears to conflate sufficiency of the evidence to support conspiracy to commit a felony, which was the delivery of a controlled substance, with sufficiency of the evidence to show that he acted in concert with Ms. Westfall to carry out the remaining criminal acts with which he was charged. For discussion purposes, we separate the two.

Syl. Pt. 1 and Syl. Pt. 3, in part, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

In regard to conspiracy, the petitioner contends that "[t]he State repeatedly asserted that without Petitioner's car, the dealer could not have delivered drugs. But without Petitioner's agreement or even complicity, he is a bystander—not a conspirator." He argues that the State failed to show an agreement between him and Ms. Westfall to sell drugs. He also claims the evidence failed to show a pre-arranged plan for him to accompany Ms. Westfall to the victim's home and that his visit to the home was "unconnected with any plan to sell drugs." The petitioner contends he was "unconscious and nearly himself a victim" due to a "non-lethal Fentanyl overdose" when Ms. Westfall decided to sell the drugs to the victim.

In discussing conspiracy under West Virginia Code § 60A-4-414(b)[21] this Court has held that the statute requires proof of "overt acts" that are in furtherance of the

---

[21] West Virginia Code § 60A-4-414(b) (2020) provides:

> (b) Notwithstanding the provisions of subsection (a) of this section, any person who willfully conspires with one or more persons to manufacture, deliver or possess with intent to manufacture or deliver one kilogram or more of heroin, five kilograms or more of cocaine or cocaine base, one hundred grams or more of phencyclidine, ten grams or more of lysergic acid diethylamide, or fifty grams or more of methamphetamine or five hundred grams of a substance or material containing a measurable amount of methamphetamine, if one or more of such persons does any act to effect the object of the conspiracy,

conspiracy. Syl. Pt. 5, in part, *State v. Legg*, 243 W. Va. 372, 844 S.E.2d 143 (2020).[22] In reaching this decision the Court relied upon its earlier decision in *State v. Less*, 170 W. Va. 259, 294 S.E.2d 62 (1981), involving the general conspiracy statute. *See* W. Va. Code § 61-10-31(2020); *see also Legg*, 243 W. Va. at 379, 844 S.E.2d at 379. In *Less*, we held that for general conspiracy the State must prove that a defendant "agreed with others to

is guilty of a felony and, upon conviction thereof, shall be imprisoned in a state correctional facility for a determinate sentence of not less than two nor more than thirty years.

We note that the petitioner was indicted for violating West Virginia Code § 60A-4-414(a) (2020), which provides:

(a) Any person who willfully conspires with one or more persons to commit a felony violation of section four hundred one [§ 60A-4-401] of this article, if one or more of such persons does any act to effect the object of the conspiracy, is guilty of a felony and, upon conviction thereof, shall be imprisoned in a state correctional facility for a determinate sentence of not less than two nor more than ten years: Provided, That the provisions of this subsection are inapplicable to felony violations of section four hundred one of this article prohibiting the manufacture, delivery or possession with intent to manufacture or deliver marijuana.

[22] The entirety of syllabus point five of *Legg* reads:

"For purposes of a crime under W. Va. Code § 60A-4-414(b), W. Va. Code § 60A-4-414(f) requires that overt acts have to be in furtherance of the conspiracy before the trier of fact can attribute to the defendant 'all of the controlled substances manufactured, delivered or possessed with intent to deliver or manufacture by other participants or members of the conspiracy.'"

243 W. Va. at 373, 844 S.E.2d at 144.

27

commit an offense against the State *and that some overt act* was taken by a member of the conspiracy to effect the object of that conspiracy." 170 W. Va. at 261, 294 S.E.2d at 63, Syl. Pt. 4, in part (emphasis added).

Applying the foregoing law to the facts of this case, the evidence showed that the petitioner was a knowing participant in the drug deal that killed the victim. The evidence demonstrated that the petitioner knew Ms. Westfall was a drug dealer because she had given him drugs more than once in exchange for him allowing her to use his vehicle. Further, Ms. Westfall testified that she told the petitioner about the pending drug exchange with Ms. Russell. Moreover, the petitioner overlooks the testimony of both Ms. Westfall and Ms. Russell in regard to the overt acts of the petitioner providing his vehicle for use in the drug transaction and accompanying Ms. Westfall into Ms. Russell's trailer after Ms. Westfall had retrieved her scales from the petitioner's car. Once inside the trailer, the petitioner was present when Ms. Russell weighed the drugs and sold them to the victim. The petitioner offered no evidence that either Ms. Westfall or Ms. Russell was lying, nor did he present any evidence to show that he was unaware of the impending drug deal when he allowed Ms. Westfall to use his car and accompanied her to the delivery. Accordingly, his challenge that there was insufficient evidence to support this conviction for conspiracy is unavailing. *See Guthrie*, 194 W. Va. at 663, 461 S.E.2d at 169, Syl. Pt.3, in part.

Second, in regard to the concerted action principle relied upon by the State to prove its case against the petitioner, he argues that he was unconscious from a "non-

lethal Fentanyl overdose" when Ms. Westfall decided to drive to Ms. Russell's to sell the drugs and did not awaken until after they arrived at the trailer. Further, he argues that his visit was unconnected with any plan to sell drugs, because "[h]e arrived spontaneously to socialize and did not even own a cell phone with which to plan any deal." Thus, the petitioner contends that he "did nothing that meaningfully and intentionally 'contribute[d] to the criminal act.'" *See* Syl. Pt. 7, *State v. Foster*, 221 W. Va. 629, 656 S.E.2d 74 (2007).

In *Foster*, we held:

> "Proof that the defendant was present at the time and place the crime was committed is a factor to be considered by the jury in determining guilt, along with other circumstances, such as the defendant's association with or relation to the perpetrator and his conduct before and after the commission of the crime." Syllabus Point 10, *State v. Fortner*, 182 W.Va. 345, 387 S.E.2d 812 (1989).

> "Under the concerted action principle, a defendant who is present at the scene of a crime and, by acting with another, contributes to the criminal act, is criminally liable for such offense as if he were the sole perpetrator." Syllabus Point 11, *State v. Fortner*, 182 W.Va. 345, 387 S.E.2d 812 (1989).

221 W. Va. at 632-33, 656 S.E.2d 77-78, Syl. Pts. 6 &7.

The evidence showed that the petitioner willingly contributed to the criminal acts charged in this case. *See id*. He allowed a known drug dealer, Ms. Westfall, to use his car in exchange for drugs. He then accompanied Ms. Westfall to Ms. Russell's trailer in the car that he provided. When Ms. Westfall returned to the petitioner's car to retrieve her scales in order to finalize the drug sale, the petitioner willingly accompanied her back

29

into the trailer and was present at the time the drug deal occurred.  The evidence established that the petitioner was much more that the unwitting participant that he now claims he was.  Accordingly, we find that the evidence was sufficient to support the jury's verdict on all counts.

## IV.  Conclusion

For the foregoing reasons, the circuit court's order is affirmed, in part; and reversed, in part, in regard to the convictions and sentences imposed on the two delivery of controlled substance counts and remanded for resentencing consistent with this opinion.

Affirmed, in part;
Reversed, in part, and remanded with directions.
